**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-2275**

HINKLE OIL & GAS, INCORPORATED, an Oklahoma Corporation,

Plaintiff - Appellant,

v.

BOWLES RICE MCDAVID GRAFF & LOVE, LLP, a West Virginia
Limited Liability Partnership; CHARLES B. DOLLISON; JULIA A.
CHINCHECK; DOES 1 – 100; MARC MONTELEONE; GERARD STOWERS,

Defendants - Appellees.

Appeal from the United States District Court for the Western
District of Virginia, at Roanoke.  Samuel G. Wilson, District
Judge.  (7:07-cv-00487-sgw-mfu)

Argued:  October 29, 2009                Decided:  January 5, 2010

Before NIEMEYER and DUNCAN, Circuit Judges, and Benson E. LEGG,
United States District Judge for the District of Maryland,
sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Hugo Nathan Gerstl, HUGO N. GERSTL, INC., Monterey,
California, for Appellant.  William Delaney Bayliss, WILLIAMS
MULLEN, Richmond, Virginia, for Appellees.  **ON BRIEF:** Brendan D.
O'Toole, WILLIAMS MULLEN, Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Hinkle Oil & Gas, Inc. ("Hinkle") challenges the district court's grant of summary judgment in favor of the law firm Bowles Rice McDavid Graff & Love, LLP ("Bowles Rice"), and individual partners Charles Dollison, Marc Monteleone, Julia Chincheck, and Gerard Stowers on Hinkle's claims for intentional interference with economic advantage, breach of fiduciary duty, and legal malpractice. For the reasons set forth below, we affirm.

I.

A.

Appellant Hinkle, an oil and gas well development company, had a sister corporation named Minerals Management Group, Inc. ("MMGI"). In 1997, MMGI sued Buffalo Properties, LLC ("Buffalo") over the leasing rights to two oil and gas wells in Kentucky. The litigation continued into 2004, at which point Buffalo sought Chapter 11 bankruptcy protection.

On June 6, 2005, the bankruptcy matter became a Chapter 7 proceeding. Buffalo's eligible assets were transferred to its bankruptcy estate. The assets included 19 wells in Kentucky ("KY wells") and 274 wells in West Virginia ("WV wells"). A bankruptcy trustee was appointed to liquidate Buffalo's assets and pay off creditors.

In early spring 2006, the trustee negotiated a plan under which Hinkle would buy the KY wells for $400,000 and would drop MMGI's lawsuit against Buffalo. On March 1, 2006, the trustee faxed Hinkle a proposed contract for the KY wells reflecting the $400,000 price. Hinkle then hired attorney Julia Chincheck of the Bowles Rice law firm to complete the negotiations and obtain approval from the bankruptcy court. Although Chincheck notified her partners about this matter, none reported a conflict relating to Hinkle or Buffalo. Hinkle paid a $5,000 retainer and Chincheck began representation.

On May 3, 2006, the trustee moved for the bankruptcy court to approve a proposed contract to sell the WV wells to Applied Mechanics Corporation ("AMC") for $400,000. On May 23, 2006, two of Buffalo's creditors, Mervil Perry and the Estate of Bobby Gillispie ("Gillispie"), filed separate objections to the proposed sale.

That same day, the bankruptcy trustee agreed to sell the KY wells to Elk River Energy, LLC ("Elk River") for $450,000, abandoning the tentative plan to sell to Hinkle for $400,000. On May 25, 2006, the trustee moved for the bankruptcy court to approve this sale.

Elk River had been recently organized by two Bowles Rice partners, Charles Dollison and Marc Monteleone, and a friend of theirs. It is unknown whether any Bowles Rice partners knew of

4

the potential conflict between Elk River and Hinkle when Chincheck opened the Hinkle file.[1]  Bowles Rice became aware of the conflict at least by early May when the trustee informed Dollison that his law partner, Chincheck, was representing Hinkle.  According to the district court's opinion, Dollison assured the trustee, "Don't worry, I'll take care of it."  J.A. 736.

Bowles Rice did not, however, resolve the conflict or even inform Hinkle that its partners were involved with Elk River. Hinkle only learned of the conflict through its own independent investigation.  At a meeting on May 25, 2006, the trustee told Hinkle that Buffalo had entered into a written contract to sell the Kentucky wells to Elk River.  This information prompted Hinkle to investigate Elk River, and the inquiry unearthed the involvement of the Bowles Rice partners.  Hinkle then confronted Bowles Rice, demanding that Elk River mitigate the harm to Hinkle by assigning its contract to Hinkle and paying Hinkle the $50,000 difference.  Bowles Rice rejected this demand.  Hinkle never requested that Bowles Rice return its retainer fee, and the firm never did.

---

[1] Bowles Rice concedes that a conflict exists for purposes of this case.

Dollison and Monteleone then met with Gerard Stowers, who oversaw risk management for Bowles Rice. Based on the group's decision, Bowles Rice stopped representing Hinkle, and Elk River requested that the trustee withdraw his May 25, 2006, motion for court approval of the sale. The trustee rejected that request.

The proposed contract of sale to Elk River allowed for "upset bids," namely, higher bids by outside parties that would trigger an auction to the highest bidder. The sales contract stated, "The sale . . . allows . . . upset bids in an amount of $455,000[] or more . . . provided such upset bid is accompanied by an earnest money deposit of $25,000 in immediately available funds." J.A. 430. On June 9, 2006, Hinkle submitted to the trustee and the bankruptcy court a $455,000 upset bid with the required $25,000 earnest money. The upset bid included a proposed purchase agreement that, by its own terms, was subject to the approval of the court. On June 12, 2006, Elk River filed an objection to the trustee's May 25, 2006, motion for approval of its own sales contract, explaining that Hinkle had threatened litigation.

On July 3, 2006, the bankruptcy court received a letter of intent from First South Investments offering to purchase all of Buffalo's assets for $2,500,000. On July 7, 2006, before taking any action on the proposed sale of the KY wells to Elk River, the court held a hearing on the trustee's May 3, 2006, motion to

approve the sale of the WV wells to AMC. The trustee, Perry, and Gillispie were represented at the hearing. Energy One Group, Inc. ("EOG"), who had submitted an upset bid in that sale, and James Clowser, who was a member of Buffalo, were also represented. At the hearing, the creditors and Clowser informed the court that "at least two entities had expressed interest in acquiring all of the assets of the Debtor for substantially more than the total of the highest existing bids for the West Virginia Oil and Gas Asset and the Kentucky Oil and Gas Asset of the Debtor." J.A. 505.

On July 17, 2006, the court decided the motion. In its order, the court noted the mention of the higher offers. The court sustained the creditors' objection to the WV wells sale and ordered the trustee to propose new sale procedures that would permit credit bidding, allow prospective buyers to make one bid for the KY wells and WV wells combined, and provide for an auction to choose among multiple qualifying bids. The trustee soon proposed new procedures, which the court approved over Hinkle's objection.

The trustee eventually auctioned off Buffalo's assets under the new procedures. Hinkle made the highest bid for the KY wells at $500,000. But the overall highest bidder was Heritage Financial Group, Inc. ("Heritage"), which offered $7,000,000 for all of Buffalo's assets. Elk River did not bid at all. After

7

making the purchase, Heritage transferred Buffalo's assets to Mountain County Partners ("MCP") and dissolved.

B.

After losing the auction, Hinkle brought this action against Appellees Bowles Rice, Dollison, Monteleone, Chincheck, and Stowers. The amended complaint alleged intentional interference with economic advantage (Count 1), breach of fiduciary duty (Count 2), conversion or misappropriation of property (Count 3), and legal malpractice (Count 7).[2]

Hinkle and Appellees filed cross-motions for summary judgment. On September 17, 2008, the district court awarded summary judgment to Appellees. The court found that Counts 1, 2, and 7 failed because Hinkle was unable to prove that Appellees caused it not to obtain the KY wells. The court also said Count 3 failed because Hinkle never demanded the $5,000 retainer, which remained in Bowles Rice's client trust account. Hinkle was given ten days to file an amended complaint asserting claims that did not require proof of causation. On September 18, 2008, Hinkle filed a motion for reconsideration, which the court denied. On September 19, 2008, Hinkle filed another amended complaint. The court dismissed the amended complaint on

---

[2] Hinkle abandoned Counts 4-6 of its original complaint.

October 28, 2008, finding that all the claims raised therein required proof of causation.  This appeal followed.

## II.

Hinkle challenges the district court's grant of summary judgment, asserting error in its conclusion that Hinkle failed to produce sufficient evidence of causation for Counts 1, 2, and 7.[3]  Hinkle asserts that it presented sufficient evidence to raise a factual question as to causation because it showed that, had Elk River not objected to its own sale contract for the KY wells, Hinkle would have been the successful upset bidder.[4]

We review de novo a grant of summary judgment.  Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009).  Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

_____

[3] Hinkle does not challenge and thus waives objection to the district court's grant of summary judgment on Count 3.

[4] Hinkle concedes that its intentional interference with economic advantage, breach of fiduciary duty, and legal malpractice claims all require proof that Appellees' conduct was the proximate cause of Hinkle's failure to obtain the KY wells. West Virginia law defines proximate cause to mean "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred."  Spencer v. McClure, 618 S.E.2d 451, 455 (W. Va. 2005) (citation and internal quotations omitted).

judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). We construe the evidence in the light most favorable to Hinkle and draw all reasonable inferences in its favor. See Smith, 578 F.3d at 250. Although Hinkle does not have to show that Appellees' conduct "was the sole proximate cause of the injury," Spencer, 618 S.E.2d at 455-56 (emphasis omitted), "a mere possibility of causation is not sufficient" to defeat summary judgment, id. at 456 (citation and quotations omitted).

Hinkle argues that Elk River's objection caused it to lose in the bidding process. Its position hinges on an assertion of inevitability: had Elk River not objected, the process would have proceeded quickly to a resolution in its favor. The record, however, does not bear this out.

In this case, the bankruptcy court restructured the bidding process in a way that caused Hinkle to be unsuccessful in its bid. It is clear from the court's July 17, 2006, order that this restructuring occurred as a result of the July 7, 2006, hearing during which Buffalo's creditors for the WV wells brought to the court's attention the fact that "at least two entities had expressed interest in acquiring all of [Buffalo's] assets . . . for substantially more than the total of the highest existing bids." J.A. 505. Therefore, to show that Elk River's objection caused Hinkle to lose the bid, Hinkle would have to present evidence that, absent Elk River's objection, the

10

bankruptcy court would have authorized the trustee's sale of the KY wells to Hinkle as the upset bidder prior to July 7, 2006, and would therefore not have had occasion to place the KY sales back into play. However, Hinkle has not presented any evidence that would permit it to assert with any certainty that the bankruptcy court would have approved the sale before that date.

Hinkle's upset bid documents clearly indicate that the proposed sales agreement between the trustee and Hinkle was subject to the bankruptcy court's approval.[5] Hinkle argues, however, that the court would have approved the sale "pro forma" shortly after Hinkle's upset bid. This assumption contradicts the trustee's testimony that "there is always a chance" that the court might reject the sale. J.A. 266. In fact, in his deposition, the trustee agreed that "it would be speculation to guess whether [the sale] would [have] be[en] approved" by the bankruptcy court. J.A. 262. Hinkle's assumption also ignores

---

[5] Although Hinkle argues that the bankruptcy court's approval was not legally required, the evidence in the record strongly supports the inference that the trustee would not have acted without the court's approval. The trustee filed a motion with the court requesting its approval to complete the Elk River sale. Also, both Elk River's sale contract and Hinkle's upset bid expressly provided that any sale of the property was "subject to [the] approval of the Bankruptcy Court." J.A. 413, 454. Therefore, whether or not the approval was legally required, there is absolutely no support for the assumption that the trustee would have reversed course and attempted to finalize the Hinkle sale without the court's approval.

11

the fact that, on July 3, 2006, the court received a letter of intent from First South Investments offering $2,500,000 for all of Buffalo's assets. It would be mere speculation to assume that the court would have ignored that offer and approved the Hinkle sale. Furthermore, Hinkle's assumption that the court would have taken a purely passive role in approving the sale is contradicted by the court's proactive involvement in directing the trustee to restructure the bidding process in order to create the potential for higher returns for Buffalo's creditors.

Even assuming that the bankruptcy court would have approved the sale, Hinkle has presented no evidence to support the inference that the approval would have occurred before the July 7, 2006, hearing that led to the bidding restructuring. Hinkle merely speculates that the "pro forma" approval of the court would have occurred in approximately one day. Hinkle cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.")

Hinkle's unsupported assertion that, but for Elk River's objection, the bankruptcy court would have approved the upset

12

bid before having an opportunity to restructure the bidding process is not sufficient to defeat Appellees' summary judgment motion.

## III.

Accordingly, for the reasons stated above, we

<u>AFFIRM</u>.